**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| WAYNE LANGDON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 14-cv-6980 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| PRINCIPAL LIFE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Wayne Langdon claims that Defendant Principal Life Insurance Company wrongly denied his claim for long-term disability benefits by concluding that his squamous cell carcinoma was a preexisting condition that was not covered under Plaintiff's group policy. Before the Court are the parties' cross-motions for summary judgment [39, 43]. For the reasons set forth below, Defendant's motion for summary judgment [39] is denied and Plaintiff's motion for summary judgment [43] is granted. This case is set for further status on October 3, 2016, at 10:00 a.m. to discuss further proceedings and the possibility for settlement.

## I.      Background

The Court takes the relevant facts from the parties' Local Rule 56.1 statements, construing the facts in the light most favorable to the nonmoving party.[1]

Plaintiff Wayne Langdon began working for Advance Engineered Systems, Inc. ("AES") as a control engineer on December 17, 2012, earning an annual salary of $78,000. As an

---

[1] Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and entitles the movant to judgment as a matter of law. The rule permits a movant to file up to 80 separately-numbered statements of undisputed facts. L.R. 56.1(a)(3). The rule also requires the nonmovant to file a concise response to the movant's statement of facts setting forth "any disagreement, specific references to the affidavits, parts of the record, and other supporting materials." L.R. 56.1(b)(3)(A).

employee of AES, Plaintiff received coverage under AES's long-term disability plan, which was insured by Defendant Principal Life Insurance Company per the terms of a group insurance policy. In March 2013, Plaintiff was diagnosed with squamous cell carcinoma (throat cancer), prompting him to seek both short-term and long-term disability benefits under the policy. Defendant granted Plaintiff's request for short-term benefits, but denied Plaintiff's claim for long-term benefits, concluding that Plaintiff's disability was caused by a preexisting condition. Plaintiff appeals that decision.

The group insurance policy does not provide benefits for any disability that "is caused by, a complication of, or resulting from a Preexisting Condition as described in th[e] Group Policy." [55, ¶ 12.] The group policy defines "preexisting condition" as follows:

> A Preexisting Condition is any sickness or injury, including all related conditions and complications, or pregnancy, for which a Member:
>
> a.  received medical treatment, consultation, care, or services; or
>
> b.  was prescribed or took prescription medications;
>
> in the three month period before he or she became insured under the Group Policy.
>
> No benefits will be paid for a Disability that results from a Preexisting Condition unless, on the date the Member becomes Disabled, he or she has been Actively at Work for one full day after completing 12 consecutive months during which the Member was insured under the Group Policy.

[55, ¶ 13.] Plaintiff's long-term disability coverage became effective on February 1, 2013. [54, ¶ 47.] The relevant question, then, was whether the medical care that Plaintiff received in the three month period preceding February 1, 2013, qualified as care relating to his disability (*i.e.*, squamous cell carcinoma) as defined by this preexisting condition clause.

## A.    Plaintiff's Medical History

In February 2009, Plaintiff visited his dentist, Dr. Chung, on two separate occasions regarding, in Dr. Chung's words, dental work that was "breaking down." Dr. Chung reported, among other things, that Plaintiff was experiencing temperature sensitivity in his #3 molar. In May 2009, Plaintiff saw Dr. Chung again, this time regarding his #2 and #3 molars, and Dr. Chung noted a "starting abscess" and reported that Plaintiff continued to experience discomfort based on sensitivity to temperature. Dr. Chung treated Plaintiff with a root canal and a crown on tooth #3. Plaintiff returned for another visit in June 2009, where Dr. Chung noted that the "crown was rocking" and did not fit well, and so Dr. Chung installed a temporary crown and sent the permanent crown "back to the lab" for further adjustments. Dr. Chung installed the modified crown later that month.

Three months later, in September 2009, Plaintiff saw Dr. Chung for an "emerg[ency] exam" for "pain with pressure" relating to the same tooth (#3), even when not biting down. The examination showed no infection, but noted "large sinuses." The doctor noted that the crown was "a little high," and noted that Plaintiff's discomfort stemmed from the crown height and his large sinuses. Plaintiff was told to follow up in two weeks if the pain persisted. Plaintiff returned to Dr. Chung approximately one week later reporting continuing discomfort. Dr. Chung adjusted Plaintiff's crown and filling. Plaintiff reported that his bite felt better after the adjustment, but Dr. Chung noted that Plaintiff "[s]till ha[d] unfinished treatment" that would be continued.

Plaintiff next saw Dr. Chung for an oral exam in November 2010, more than a year later. The doctor's notes read "oral ex – wnl," which apparently means that the examination was "within normal limits." The parties dispute whether the doctor's notes refer to the dental examination as "consistent" or "constraint," although it appears to be the former. [See 46-20, at

40.] Regardless, Dr. Chung did not schedule any follow-up visits, and Plaintiff did not see Dr. Chung again for another year.

In January 2012, Plaintiff saw Dr. Chung for a teeth cleaning and oral examination, the latter being "wnl." The doctor's notes reflect some discussion of crowns and that his office was "checking on ins[urance] to see if they will cover crowns yet." [46-20, at 41.] Plaintiff returned the following month for prep work relating to another crown installation (on tooth #15—a different tooth than the one that was treated in 2009), where the dentist "shaped tooth down, packed cord, made temp, took final impression," and scheduled a follow-up visit in two weeks. However, five days later, Plaintiff returned for an "emer[gency] exam" after experiencing "heat and cold sensitivity and pressure." The doctor recommended another root canal and prescribed Plaintiff antibiotics. Plaintiff returned to Dr. Chung two days later for another unscheduled "emer[gency] exam," and the doctor's notes reflect that a "pulpotomy" was performed under local anesthetic (carbocaine). [46-20, at 41.] Five days later, on March 12, 2012, Dr. Chung performed a root canal on the offending tooth (#15), and after an x-ray confirmed that "everything looks good," the doctor reinstalled the temporary crown. Plaintiff returned on March 21, 2012 for additional adjustments and the installation of the permanent crown.

A few months later, on June 4, 2012, Plaintiff returned to Dr. Chung for another "emer[gency] exam," this time relating to "pain and sensitivity" in two different teeth (#30 and #31). Dr. Chung confirmed the sensitivity, but noted no infection in the reported area. Instead, Dr. Chung located a developing infection with tooth #3—the tooth that Dr. Chung performed a root canal on in 2009. Dr. Chung noted that Plaintiff might need a second root canal on that tooth, and then adjusted the existing crown, thinking that it was pressing down on the area where Plaintiff reported pain and sensitivity. Four days later, Plaintiff returned for a second root canal

on the offending tooth. Upon examination, Dr. Chung delayed treatment for two weeks. After further examination on June 25, 2012—during which Plaintiff experienced pain and was treated with lidocaine—Dr. Chung concluded that the tooth in question needed to be extracted. The doctor continued the procedure on the following day (including the installation of a temporary tooth), also performing a full-mouth periodontal evaluation wherein Dr. Chung noted inflammation and discussed flossing with Plaintiff.

On October 30, 2012, Plaintiff saw Dr. Chung again relating to pain in tooth #15—the tooth that received a root canal in early 2012. After performing an endoscope and a tap test, Dr. Chung agreed that Plaintiff reacted "most to #15," and referred Plaintiff to an endodontist to retreat the prior #15 root canal. On November 15, 2012, Dr. Chung took out the temporary filling in #15 and installed a permanent filling. Two weeks later, on November 29, 2012, Plaintiff returned to Dr. Chung, reporting swelling on the lower left side of his jaw and headaches for "the last couple of weeks." [46-20, at 44.] The doctor's notes show that he "didn't see anything on x-rays," and that tooth "#15 has reacted to palpation but not percusion [sic]." Dr. Chung prescribed Plaintiff the antibiotic clindamycin and asked him to report back in one week.

On December 6, 2012, Dr. Chung further examined the swelling on Plaintiff's lower jaw, noting that it was hard to the touch. The doctor requested x-rays on both Plaintiff's upper and lower jaws, but saw no signs of infection. Dr. Chung referred Plaintiff to his primary doctor. [46-20, at 44.]

On January 2, 2013, Plaintiff saw internist Dr. Linda Razbadouski. He reported to her that he underwent a root canal on tooth #15 on November 20, 2012, and that four days later he experienced enlarged lymph nodes, which had remained swollen for four weeks. The doctor's examination of Plaintiff revealed an "[e]nlarged parotid/lymph node 3cm firm, tender, warm to

touch" on the left side of Plaintiff's face. [46-3, at 35.] Dr. Razbadouski referred Plaintiff to general surgeon Dr. Mark D. Zarnke for further evaluation.

Plaintiff saw Dr. Zarnke later that same day about the swelling in his left neck. Plaintiff told Dr. Zarnke that the swelling developed after undergoing certain dental work, and that the tenderness and swelling has not subsided since then. Plaintiff reported no difficulty swallowing, no pus, no sour taste in his mouth, no drainage from his neck, and no headaches. Dr. Zarnke reported the following:

> PHYSICAL EXAMINATION: The patient is 6'1", 280 lbs. HEENT[2] is significant for notable left-sided facial mass and neck mass. There is swelling at the angle of the mandible and going forward and somewhat inferior. It is somewhat warm and does feel somewhat inflammatory. Upon examining the inside of his mouth, he does not have any evidence of bleeding or infection. No significant odor. Neck is otherwise supple with no adenopathy. The remainder of the exam is essentially normal.

> IMPRESSION: The patient does appear to have what I would think is parotid swelling. Given his history of dental work and manipulation, this may be infectious or inflammatory. We also must be concerned about a tumor.

> RECOMMENDATIONS: Because of limited funding at this time, he would like to minimize the workup as best as possible. Therefore, I felt that it would be reasonable to have him undergo symptomatic treatment for right now and see how this goes. We will follow him closely. I have recommended that if he does have a sialadenitis,[3] it might respond to sucking a lemon or lime juice. I also recommend Augmentin 875 mg p.o. b.i.d., Norco, and Aleve. He will follow up with me in two weeks or so to make sure he is making improvement.

[46-22, at 13.] Approximately two weeks later, on January 16, 2013, Plaintiff followed up with Dr. Zarnke as instructed. Despite Plaintiff's reports that "he may have improved or be a little less tender," Dr. Zarnke noted that Plaintiff "look[ed] no better" and that he "d[id] not think that there ha[d] been any real improvement in [Plaintiff's] symptoms." [40-22, at 14.] Dr. Zarnke explained to Plaintiff that he was "concerned more now that this may represent a parotid mass,"

---

[2] HEENT is an acronym that stands for head, ears, eyes, nose, and throat.

[3] Sialadenitis is a type of infection.

but Plaintiff was "hesitant to do any significant workup" because he was "worried about cost," which Dr. Zarnke said was "understandable." [*Id.*] Dr. Zarnke talked to Plaintiff "about the potential that this could be a significant diagnosis," and they agreed to arrange for a CT scan of Plaintiff's neck. [*Id.*]

Plaintiff underwent his first CT examination by Dr. Donald Pierantozzi at Forest City Diagnostic Imaging on February 6, 2013. The doctor reported that Plaintiff's "parotid glands appear[ed] normal," but that the mass was "worrisome for an aggressive neoplasm." [46-22, at 21.] On February 13, 2013, Plaintiff returned to Dr. Zarnke, who reviewed the results of the CT examination and offered the following evaluation:

> The patient is seen in followup [sic] for his left neck mass. He has gone to Forest City where he had a diagnostic study done, which demonstrates findings very worrisome for an aggressive infiltrating carcinoma of his left neck. This certainly is consistent with the evaluation of his neck. The antibiotics and anti-inflammatories have had no effect, and the CT scan certainly appears significantly warning of a neoplasm. A parotid/salivary tumor is probably most likely versus a squamous carcinoma of the neck. Therefore, I recommended that he be evaluated by Dr. Zahurullah here in town for suitability for exploration and removal. I am referring the patient to him.

[46-22, at 15.]

Plaintiff saw Dr. Zahurullah on February 15, 2013, who reported the following:

> I reviewed the CT and the report. I do not think this is a parotid mass. I think this is a deeper mass that is deep to the sternocleidomastoid muscle. Based on that, we did do an endoscopic examination and a fine-needle aspiration biopsy. The endoscopic examination was essentially unremarkable. The remainder of the physical exam, other than the mass itself, was unremarkable. In the history, it seems that he has not had an extensive smoking history, although he smoked for three years prior to 2012. He had not been smoking for about 20 years prior to that, so presumable from 1987 to 2007 he had not been smoking and then for three years between 2007 and 2010 he had been smoking. He reports only about 1/4 pack a day or five cigarettes a day. Furthermore, he has no significant upper respiratory tract symptoms, so it is difficult to say what the nature of this mass is. We did do the [fine-needle aspiration]. We will have him back as soon as we know that the [fine-needle aspiration] is, then we can make a decision as to where we should proceed. If it is positive, I think it will give us a specific direction as to

where to go. If it is negative, we may have to consider doing an open biopsy with the plan of possible neck dissection. We will be seeing him next week.

[46-5, at 15–16.] Plaintiff saw Dr. Zahurullah again on February 20, 2013, after the doctor received the results from Plaintiff's fine-needle aspiration biopsy ("FNA"). Dr. Zahurullah reported that the "FNA showed squamous cell carcinoma." [46-5, at 26.] Based on that finding, the doctor ordered a PET scan. Plaintiff underwent a PET scan later that same day, and the attending physician made the following impressions:

1. Hypermatabolic mass compatible squamous of carcinoma involving the region of the left parotid gland.

2. Level V and level III hypermetabolic lymph nodes on the left side, as described above.

3. Persistent hypermetabolic subcarinal lymphadenopathy, could represent residua of prior infections/inflammatory process of the chest or could represent metastatic disease to the mediastinum. It is thought most likely to be related to prior infections/inflammatory process.

[46-13, at 51–52.]

Eight days later, on February 28, 2012, Plaintiff was admitted to Rockford Memorial Hospital for "[s]econdary and unspecified malignant neoplasm of lymph nodes, site unspecified," "Mal neo lymph node NOS," and "Malignant neoplasm of connective and other soft issue of head, fact, and neck." [46-14, at 53.] Plaintiff underwent a neck operation (called a "radical neck dissection"), which identified "poorly differentiated squamous cell carcinoma extensively infiltrating soft tissue and muscle." [46-4, at 95.] Plaintiff saw Dr. Zahurullah on March 7 (assumedly while Plaintiff was still in the hospital recovering from his surgery), and after noting that "[t]he patient is known with a left side of neck squamous cell carcinoma of unknown primary," the doctor reported that Plaintiff was having difficulty taking liquids orally, and he ordered intravenous hydration. [46-26, at 28.] On March 11, 2013, Plaintiff had his "first postoperative visit [with Dr. Zahurullah] after having left-sided neck dissection [and] multiple

endoscopic biopsies," and the doctor noted that "[t]he neck mass came back positive for extensive squamous cell carcinoma infiltrating the muscle and surrounding tissues," and that "[m]ultiple lymph nodes were positive as well." [46-14, at 59.] A second CT scan was performed post-surgery on May 21, 2013, which confirmed "[n]o lesions in the remaining right submandibular gland, parotid glands or thyroid." [46-13, at 47.]

**B.      Plaintiff's Insurance Claims**

Plaintiff's long-term disability coverage became effective on February 1, 2013. Plaintiff's final day of work at AES was February 27, 2013—one day before his neck surgery. In March 2013, Plaintiff submitted claims for both short-term and long-term disability benefits. AES approved Plaintiff's request for short-term disability benefits, and Plaintiff received benefits for the full period of eligibility, through August 28, 2013. On October 10, 2013, Defendant denied Plaintiff's claim for long-term disability benefits, concluding that "[s]ince [Plaintiff] w[as] treated by Dr. Razabadouski and Dr. Zarnke for enlarged parotid lymph node during the 3 month period before [his] coverage was effective, [his] condition is considered a Preexisting condition" as defined by the group policy. [46-21, at 199.]

On February 4, 2014, Plaintiff appealed Defendant's denial of his claim, arguing that his disability was not preexisting, and that Defendant had an obligation to approve his request pursuant to certain rules and regulations applicable to New York insurers. Defendant referred Plaintiff's file to a vendor called Reed Review Services for review by an oncologist. While Plaintiff disputes the thoroughness and accuracy of the agency's report (as well as its purported independence), the agency concluded that Plaintiff's treatment during the relevant period was related to his squamous cell carcinoma. On April 22, 2014, Defendant denied Plaintiff's appeal, again citing the preexisting condition provision in the group policy. [46-12, at 8–11.]

Plaintiff filed a voluntary appeal on May 21, 2014. Plaintiff supplemented his appeal July 21, 2014, providing documentation where each of his treating physicians (Dr. Chung, Dr. Razbadouski, Dr. Zahurullah, and Dr. Zarnke) checked "No" in response to questions about whether they treated Plaintiff or prescribed him medication for his diagnosis of squamous cell carcinoma prior to February 1, 2013. And in addition to reiterating his arguments regarding Defendant's obligations under New York rules and regulations, Plaintiff also referenced Defendant's obligations under the Illinois Insurance Code. Defendant again sent Plaintiff's file to Reed Review Services for an "independent review." And again, while Plaintiff criticizes the purported independence of the reviewer and the completeness of the report, the agency concluded that Plaintiff's treatment related to his "current condition." On August 13, 2014, Defendant denied Plaintiff's voluntary appeal, upholding its prior conclusions regarding Plaintiff's preexisting condition. [46-1, at 361–64.] Plaintiff filed this lawsuit the following month, on September 9, 2014.

## II.    Legal Standard

### A.    Summary Judgment Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also *Sallenger v. City of Springfield, Ill.*, 630 F. 3d 499, 503 (7th Cir. 2010) (citing Fed. R. Civ. P. 56(c)(2) and noting that summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law"). In determining whether summary judgment is appropriate, the court should construe all facts and reasonable inferences in the light most favorable to the non-moving party. See *Carter v. City of Milwaukee*,

743 F. 3d 540, 543 (7th Cir. 2014). Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party would bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Put another way, the moving party may meet its burden by pointing out to the court that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

To avoid summary judgment, the opposing party then must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). For this reason, the Seventh Circuit has called summary judgment the "put up or shut up" moment in a lawsuit—"when a party must show what evidence it has that would convince a trier of fact to accept its version of events." See *Koszola v. Bd. of Educ. of City of Chi.*, 385 F. 3d 1104, 1111 (7th Cir. 2004). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## B. ERISA Standard

"[A]n insurance policy is a written contract that memorializes an agreement or 'meeting of the minds' between the insurer [Defendant] and the insured [Plaintiff]." *Pitcher v. Principal Mut. Life Ins. Co.*, 93 F.3d 407, 411 (7th Cir. 1996). "In exchange for the payment of premiums by [Plaintiff], [Defendant] agreed to cover certain medical expenses of [Plaintiff's], subject to the terms and conditions of the contract (including the pre-existing condition clause)." *Id.* "Because the policy issued by [Defendant] was part of an employee benefit plan, this action is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.

§ 1132(a)(1)(B)." *Id.* ERISA requires courts "to apply federal common law rules of contract interpretation when interpreting the terms of an employee health insurance policy." *Bullwinkel v. New England Mut. Life Ins. Co.*, 18 F.3d 429, 431 (7th Cir. 1994) (citing *Hammond v. Fidelity and Guar. Life Ins. Co.*, 965 F.2d 428, 430 (7th Cir. 1992)). "Federal common law rules of contract interpretation parallel equivalent state rules. We interpret ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience, and we construe ambiguities in ERISA plans against the drafter." *Meredith v. Allsteel Inc.*, 11 F.3d 1354, 1358 (7th Cir. 1993).

The parties agree that the Court's review of Defendant's denial of Plaintiff's long-term disability benefits is reviewed *de novo* because the group policy does not contain an express grant of discretionary authority to Defendant to determine eligibility for benefits. See *Schultz v. Aviall, Inc. Long Term Disability Plan*, 670 F.3d 834, 837 (7th Cir. 2012) (In ERISA cases, "a denial of benefits * * * is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case a deferential standard of review is appropriate.").

## III. Analysis

### A. Preexisting Condition

Defendant denied Plaintiff's request for long term disability benefits, claiming that his disability (*i.e.*, squamous cell carcinoma) was a preexisting condition. According to the group policy governing Plaintiff's long term disability benefits, a preexisting condition is "any sickness or injury, including all related conditions and complications, or pregnancy, for which a Member (a) received medical treatment, consultation, care, or services; or (b) was prescribed or took prescription medications; in the three month period before he or she became insured under the Group Policy." Plaintiff became insured under the group policy on February 1, 2013. The

question, then, is whether the medical care that Plaintiff received from November 1, 2012 through January 31, 2013, qualified as care relating to his "sickness or injury, including all related conditions and complications" as defined by the preexisting condition clause in the group policy.

It is undisputed that Plaintiff was not diagnosed with throat cancer until *after* the relevant three month period. The first mention of squamous cell carcinoma appears in Plaintiff's medical records on February 20, 2013, when Plaintiff saw Dr. Zahurullah after the doctor received the results from Plaintiff's fine-needle aspiration biopsy ("FNA"), and Dr. Zahurullah reported that the "FNA showed squamous cell carcinoma." [46-5, at 26.] However, it is also undisputed that Plaintiff saw several doctors *during* the relevant three-month period and that those doctors examined and treated the swelling on Plaintiff's neck that was *later* diagnosed as squamous cell carcinoma. Plaintiff had, at most, six medical examinations during this three month period (although Defendant discounts Plaintiff's three visits with his dentist, claiming that Dr. Chung is not a medical doctor):

- **November 15, 2012:** Dr. Chung installed a permanent filling on Plaintiff's tooth #15 following a second root canal on that tooth.

- **November 29, 2012:** Plaintiff saw Dr. Chung, and reported swelling on the lower left side of his jaw and headaches for the past couple of weeks. Dr. Chung took x-rays but "didn't see anything," and prescribed Plaintiff the antibiotic clindamycin and asked him to report back in one week.

- **December 6, 2012:** Dr. Chung further examined the swelling on Plaintiff's lower jaw, noting that it was hard to the touch. The doctor requested x-rays on both Plaintiff's upper and lower jaws, but saw no signs of infection. Dr. Chung referred Plaintiff to his primary doctor.

- **January 2, 2013:** Plaintiff saw internist Dr. Razbadouski and reported that he recently underwent a root canal and that four days later he experience large lymph nodes, which remained swollen since then. Dr. Razbadouski found "[e]nlarged parotid/lymph node 3cm firm, tender, warm to touch" on the left side of

Plaintiff's face, and referred Plaintiff to general surgeon Dr. Zarnke for further evaluation.

- **January 2, 2013:** Plaintiff saw Dr. Zarnke regarding the swelling that occurred following his dental work in November 2012. Dr. Zarnke reported the following: "The patient does appear to have what I would think is parotid swelling. Given his history of dental work and manipulation, this may be infectious or inflammatory. We also must be concerned about a tumor." He also noted Plaintiff's request to "minimize the workup as best as possible" because of limited funding, and Dr. Zarnke agreed that symptomatic treatment "would be reasonable" for the time being. He prescribed Plaintiff Augmentin, Norco, and Aleve, and requested a follow-up visit in two weeks.

- **January 16, 2013:** Dr. Zarnke concluded that Plaintiff's symptoms had not improved. Dr. Zarnke was "concerned more now that this may represent a parotid mass," but Plaintiff was "hesitant to do any significant workup" because he was "worried about cost," which Dr. Zarnke said was "understandable." Dr. Zarnke talked to Plaintiff "about the potential that this could be a significant diagnosis," and they agreed to arrange for a CT scan of Plaintiff's neck, which occurred on February 6, 2013.

Defendant denied Plaintiff's claim for long-term disability benefits, concluding that "[s]ince [Plaintiff] w[as] treated by Dr. Razabadouski and Dr. Zarnke for enlarged parotid lymph node during the 3 month period before [his] coverage was effective, [his] condition is considered a Preexisting condition" as defined by the group policy. [46-21, at 199.]

Plaintiff relies heavily on *Pitcher v. Principal Mut. Life Ins. Co.*, 93 F.3d 407 (7th Cir. 1996), where the Seventh Circuit held that the plaintiff's breast cancer was not a preexisting condition, even though the plaintiff underwent three medical examinations during the relevant three month period, including a mammogram to investigate lumps in her breasts. *Id.* at 411–12. For decades, the plaintiff received regular medical monitoring for a fibrocystic breast condition. That condition is unrelated to breast cancer, although it manifests in the same area of the body and can form cysts or masses that are similar to those that are formed in those with breast cancer. During her three month look-back period, the plaintiff had a routine physical examination that revealed lumps in her breasts, and when it was determined in a follow-up visit that her

treatment—removing caffeine from her diet—had failed to resolve the issue, her doctor ordered a mammogram. The Seventh Circuit noted at the outset that "[t]he key question * * * [wa]s whether, in the words of the policy, Pitcher received a 'treatment or service' for breast cancer during the ninety-day period prior to the effective date of coverage * * *, and not whether Pitcher actually had breast cancer during this time period." *Id.* at 411 (emphasis omitted). The Court ultimately concluded that these were medical services directed at the plaintiff's fibrocystic breast condition, not her later-diagnosed breast cancer, and thus her disability benefits were not avoidable pursuant to the preexisting-condition clause in her group policy.

The difficult question for the Seventh Circuit was whether the doctor's ordering of a mammogram was a "service" for breast cancer. The court concluded that it wasn't, claiming that it was "more accurately described as either (1) part of [the doctor's] efforts to evaluate and monitor her fibrocystic breast condition, or (2) a routine diagnostic procedure." *Pitcher*, 93 F.3d at 413. The Seventh Circuit noted that "[t]he fact that a physician orders a routine mammography exam *does not mean that he necessarily suspects cancer* in a particular patient, but only that he is practicing sound medicine." *Id.* (emphasis added). The inference is that if the physician *had* suspected breast cancer, then the mammogram *would have been*, at least in part, a service for breast cancer.

The Third Circuit confronted a similar issue where a plaintiff was treated for a respiratory tract infection before the effective date of her disability policy, but was later diagnosed with leukemia. *Lawson ex rel. Lawson v. Fortis Ins. Co.*, 301 F.3d 159, 165 (3d Cir. 2002). The court, relying on *Pitcher*, concluded that the plaintiff did not receive advice or treatment *for* leukemia before the effective date of coverage (with "for" being the operative word), because her physicians had not diagnosed her with leukemia yet, and thus her treatment was "for" an

improperly-diagnosed respiratory tract infection. Importantly, the court expanded on the appropriate analytical framework for cases where a patient receives medical treatment prior to being diagnosed with a qualifying long-term disability:

> In short, for the purposes of what constitutes a pre-existing condition, it seems that a suspected condition without a confirmatory diagnosis is different from a misdiagnosis or an unsuspected condition manifesting non-specific symptoms, as was the case here. When a patient seeks advice for a sickness with a specific concern in mind (*e.g.*, a thyroid lump, as in *McWilliams*, or a breast lump, as in *Bullwinkel*) or when a physician recommends treatment with a specific concern in mind (*e.g.*, a "likely" case of multiple sclerosis, as in *Cury*), it can be argued that an intent to seek or provide treatment or advice "for" a particular disease has been manifested. But when the patient exhibits only non-specific symptoms and neither the patient nor the physician has a particular concern in mind, or when the patient turns out not to have a suspected disease, it is awkward at best to suggest that the patient sought or received treatment for the disease because there is no connection between the treatment or advice received and the sickness.

*Id.* at 166 (citing *McWilliams v. Capital Telecomms. Inc.*, 986 F. Supp. 920 (M.D. Pa. 1997); *Bullwinkel v. New England Mutual Life Ins. Co.*, 18 F.3d 429 (7th Cir. 1994); *Cury v. Colonial Life Ins. Co. of Am.*, 737 F. Supp. 847, 854 (E.D. Pa. 1990)). Like the court in *Pitcher*, the Third Circuit differentiated between instances where the physician *suspected* the ultimate disability when serving the patient—and thus took that possibility into account in providing medical treatment or services—as opposed to instances where the physician performed diagnostic work without the ultimate disability in mind. The rationale in *Pitcher* and *Lawson* has become the standard for interpreting preexisting condition provisions. See also *Levin v. Sun Life Assur. Co. of Canada*, 2008 WL 834432, at *13 (N.D. Ill. Mar. 27, 2008) ("[T]he cases establish a rule that 'although a plaintiff need not be definitely diagnosed with a condition during the treatment-free period there at least must have been some concern or suspicion at that time that the observed symptoms were caused by the particular condition in order for the patient to be considered as being treated or seen *for* the particular condition.'" (quoting *Goerig v. Phoenix Home Life Mut. Ins. Co.*, 1998 WL 801793, at *7 (N.D. Ill. Nov. 13, 1998))); *Kaiser v. United of Omaha Life Ins.*

*Co.*, 2016 WL 379814, at *7 (W.D. Wis. Jan. 29, 2016); *LoCoco v. Med. Savings Ins.*, 530 F.3d 442, (6th Cir. 2008) ("[C]ourts have concluded that the ultimate condition need only have been suspected with a reasonable degree of likelihood in order to be considered 'pre-existing.'")

As in *Pitcher* and *Lawson*, at no time during the relevant three month period did Plaintiff's physicians suspect squamous cell carcinoma. The only potentially relevant "suspicion" came from Dr. Zarnke, who expressed a concern on January 2, 2013 that the swelling might be a tumor, and on January 16, 2013, noted the "potential that this could be a significant diagnosis" before ordering a CT scan. But Dr. Zarnke's non-specific reference to a tumor and to the "potential" for a "serious diagnosis" does not mean that Dr. Zarnke treated or provided services for squamous cell carcinoma. According to the medical records, Plaintiff's physicians had ideas as to the location of the swelling/mass (*e.g.*, lower jaw, upper jaw, lymph node, parotid gland, the neck generally, etc.) and its cause (*e.g.*, dental-related infection, dental-related inflammation, a mass, a tumor), but they did not articulate any suspicion of cancer generally or squamous cell carcinoma specifically.

It wasn't until Plaintiff's physicians reviewed his CT scan in February 2013—*i.e.*, *after* the relevant three month period—that the first suspicion of cancer arose. On February 6, 2013, Dr. Zarnke still thought that "[a] parotid/salivary tumor is probably most likely versus a squamous carcinoma of the neck," but he expressed a suspicion about the latter. Dr. Zahurullah reviewed Plaintiff's CT scan on February 15, 2013, and although he still did not know the precise location of the mass ("I do not think this is a parotid mass. I think this is a deeper mass that is deep to the sternocleidomastoid muscle."), or its cause ("[I]t is difficult to say what the nature of this mass is."), he ordered further diagnostic testing with at least some suspicion that the mass was cancerous ("If it is positive, I think it will give us a specific direction as to where to

go. If it is negative, we may have to consider doing an open biopsy with the plan of possible neck dissection."). It wasn't until February 20, 2013, after Dr. Zahurullah received the results from Plaintiff's fine-needle aspiration biopsy, that he expressly mentioned squamous cell carcinoma. These February 2013 visits represent the first express mention by the treating physicians of a suspicion of cancer, and thus the first instance of "medical treatment, consultation, care, or services" for Plaintiff's squamous cell carcinoma.

Thus, based on the undisputed physician reports, it cannot be said that Plaintiff received medical treatment, consultation, care, or services, or was prescribed medication for squamous cell carcinoma or any related condition before the effective date of his disability policy because the treating physicians neither knew of nor suspected squamous cell carcinoma during their diagnostic efforts. Not surprisingly, Drs. Chung, Razbadouski, and Zarnke each provided a signed statement indicating "No" in response to the question whether, prior to February 1, 2013, Plaintiff received medical treatment, consultation, care, or services, or was prescribed medication for, his diagnosis of squamous cell carcinoma. [54, ¶¶ 61–62.] As the Third Circuit said, "it is awkward at best to suggest that the patient sought or received treatment for the disease because there is no connection between the treatment or advice received and the sickness." *Lawson*, 301 F.3d at 166.

Defendant focuses on the fact that a preexisting condition includes *all related conditions*, and Defendant says that Plaintiff's "neck mass" is a condition *related to* squamous cell carcinoma. The Court is not persuaded. The case law that Defendant cites defines "related" conditions as properly-diagnosed precursor ailments that later develop into the compensable disability. See *Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, 642–44 (8th Cir. 1997) (treatment for diverticulitis was excluded due to prior diagnosis of diverticular disease, which

was a "necessary precursor" to the later illness); *Holsey v. UNUM Life Ins. Co. of Am.*, 944 F. Supp. 573, 579–80 (E.D. Mich. 1996) (disability due to blindness as a result of a glaucoma was directly attributable to preexisting condition of diabetes mellitus, triggering pre-existing condition exclusion); *Reinert v. Giorgio Foods, Inc.*, 15 F. Supp. 2d 589, 594–95 (E.D. Pa. 1998) (ulcerations on left foot were manifestations of preexisting conditions—specifically, diabetes, Charcot joint disease, and diabetic neuropathy—and benefits were properly excluded). Here, Plaintiff's neck mass *was* the ultimate illness, it just hadn't been diagnosed yet. It's not as though Plaintiff's physicians diagnosed and treated him for "neck mass," and that neck mass later became a squamous cell carcinoma. Thus, while Defendant's statement of the law may be accurate, its application of that law to this case is not.

Defendant also relies heavily on *Bullwinkel v. New England Mut. Life Ins. Co.*, 18 F.3d 429 (7th Cir. 1994), where treatment for the plaintiff's breast lump was considered treatment for the plaintiff's later-diagnosed breast cancer. But *Bullwinkel* is distinguishable for the reason explained in the Third Circuit's *Lawson* opinion: "a suspected condition without a confirmatory diagnosis is different from a misdiagnosis or an unsuspected condition manifesting non-specific symptoms." *Lawson*, 301 F.3d at 166; see also *Pitcher*, 93 F.3d at 415 ("[W]e hold that the case before us, which involves a combination of medical problems, is easily distinguishable from *Bullwinkel*, in which the plaintiff suffered from cancer *and only cancer*."). The *Bullwinkel* court did not have cause to explore the nuances of preexisting condition provisions as granularly as the *Lawson* and *Pitcher* courts did because the plaintiff's only argument in that case was that because his ultimate illness was not *diagnosed* during the relevant period, it could not have been, as a matter of law, a preexisting condition. *Bullwinkel*, 18 F.3d at 432–33 ("[T]he Bullwinkels rest their entire appeal on one argument. They claim that a court cannot conclude on summary

judgment that a lump discovered to be cancerous in September was also cancerous in July."). But the court explained that while the doctor anticipated that the breast lump would be benign, "he was concerned about the possibility of cancer," and he told the plaintiff, "Let's be safe and take it out." *Id.* at 430; see also *Pitcher*, 93 F.3d at 415 (distinguishing *Bullwinkel* based on Bullwinkel's doctor's "specific concern that the lump in her breast * * * might be cancerous"). In other words, *Bullwinkel* falls into the "suspected condition without a confirmatory diagnosis" camp. Here, Plaintiff did not reach that stage until February 2013 when Drs. Zarnke and Zahurullah reviewed the CT scan and, for the first time, suspected cancer. Thus, Defendant's reliance on *Bullwinkel* is unavailing.

### B.    Ambiguity

Plaintiff argues in the alternative that various terms in the preexisting condition provision are ambiguous, and thus any dispute over the meaning of those terms must be resolved in his favor. "It is an axiom of insurance law that 'ambiguous terms in an insurance contract will be strictly construed in favor of the insured.'" *Pitcher*, 93 F.3d at 418 (quoting *Phillips v. Lincoln Nat'l Life Ins. Co.*, 978 F.2d 302, 308 (7th Cir. 1992)); see also *Hammond v. Fidelity & Guaranty Life Ins. Co.*, 965 F.2d 428, 430 (7th Cir. 1992) ("[A]mbiguous terms in an insurance contract will be construed in favor of the insured."); *Panfil v. Nautilus Ins. Co.*, 799 F.3d 716, 719 (7th Cir. 2015) ("A provision is ambiguous if it is subject to more than one reasonable interpretation and all doubts and ambiguities must be resolved in favor of the insured.").

Various courts have relied on this maxim as an alternative means of ruling in favor of a plaintiff. See *Lawson*, 301 F.3d at 167 ("At a minimum, the pre-existing condition language in [the] insurance policy is susceptible to more than one reasonable interpretation and is therefore ambiguous. * * * Therefore, we construe the insurance policy strictly against [defendant] and

find that [plaintiff's] leukemia was not a pre-existing condition under the language of the policy."); *Hughes v. Boston Mut. Life. Ins. Co.*, 26 F.3d 269–70 (1st Cir. 1994) (plaintiff was treated for non-specific symptoms of multiple sclerosis prior to the effective date of his disability policy, and the court found both parties' interpretations of the policy reasonable and thus deemed the preexisting-condition provision ambiguous and ruled in plaintiff's favor). But see *Pitcher*, 93 F.3d at 418 (disagreeing with the district court in concluding that the terms of the preexisting condition clause were not ambiguous).

To be clear, the Court's primary ruling is that the preexisting condition provision is not ambiguous, and Plaintiff is entitled to judgment as a matter of law based on the unambiguous language of that provision. However, even if the Court were to credit Defendant's interpretation of the provision to some measurable degree, at most that would create an ambiguity—one that must be resolved in Plaintiff's favor. More specifically, the potential ambiguities in the preexisting condition provision are whether diagnostic services related to an unknown ailment constitute services related to a later-diagnosed ailment, whether and to what degree that calculus changes if the physician suspects that the illness relates to some other non-compensable ailment, and whether "related" illnesses include only properly-diagnosed precursor conditions. These ambiguities can be attributed to one or more of the undefined terms in the policy, including "related," "for," "medical treatment," "consultation," "care," or "services." But even if the Court were to conclude that Defendant's interpretation of these terms is reasonable, it also would conclude that Plaintiff's interpretation is reasonable too, requiring the Court to rule in Plaintiff's favor. This requirement of reading ambiguous contractual terms in favor of the insured provides an alternate rationale for granting summary judgment for Plaintiff.

### C. New York and Illinois Insurance Laws

Plaintiff also argues that Defendant's interpretation of the preexisting condition provision violates certain New York and Illinois laws and regulations that are applicable to insurers licensed in those states. Because the Court has already concluded that Plaintiff's illness was not a preexisting condition under the group policy, it need not address Plaintiff's alternative state-law arguments.

### D. Remedies

The parties disagree as to the appropriate remedies. Plaintiff requests an award of his long-term disability benefits as of August 29, 2013 (*i.e.*, the day after he exhausted his short-term benefits), plus prejudgment interest and attorneys' fees. Defendant says that the claim should be remanded to the claims administrator (here, Defendant), and that Plaintiff is not entitled to prejudgment interest or attorneys' fees (or that those claims are premature).

The Court is not persuaded by Defendant's argument that the case should be remanded to the claims administrator for further assessment. ERISA requires that every plan must "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, *setting forth the specific reasons for such denial*." 29 U.S.C. § 1133(a) (emphasis added); see 29 C.F.R. § 2560.503-1(g) (accompanying federal regulations); see also *Schneider v. Sentry Group Long Term Disability Plan*, 422 F.3d 621, 627–28 (7th Cir. 2005) (discussing these statutory and regulatory requirements). Defendant listed only one reason in justifying its denial of Plaintiff's claim (*i.e.*, that his condition was preexisting), but now says that the claim must be remanded for a factual determination regarding whether Plaintiff was disabled as defined in the group policy.

Defendant relies on *Pakovich v. Broadspire Services, Inc.*, 535 F.3d 601 (7th Cir. 2008), where the plaintiff was denied long-term disability benefits based on the plan's finding that she was not "disabled" because she was capable of performing the essential functions of her occupation (the "own occupation" standard). *Id.* at 602. According to her insurance plan, the "own occupation" standard was used for determining coverage eligibility during the first 24 months, and the standard for receiving benefits beyond the 24-month mark was whether the claimant was capable of performing the essential functions of *any* occupation (the "any occupation" standard). *Id.* The plan originally awarded the plaintiff benefits, but sometime during the first 24 months, it changed its decision, concluding that the plaintiff *was* capable of performing the essential duties of her own occupation and thus was not entitled to benefits. *Id.* The district court reversed, concluding that the plaintiff *was not* capable of performing the essential functions of her occupation. *Id.* But the district court went a step further in determining that the plaintiff was not entitled to benefits *beyond* the 24-month mark either, finding that she was not incapable of performing the essential functions of *all* occupations—a determination that the plan had not yet made. *Id.* The Seventh Circuit reversed the latter decision, holding that the district court went too far in addressing the "any occupation" question in the first instance. The Seventh Circuit excused the plan for not addressing that issue initially, noting that because the plan determined that the plaintiff was capable of performing her own job, it would have been redundant to address whether she was capable of performing *any* job—the plan's initial finding assumes the answer to that question, and any finding to the contrary would have created an internal inconsistency. *Id.* at 605. Once the district court removed that redundancy by reversing the plan's decision and holding that the plaintiff *was not* capable of performing her own job, it became necessary (for the first time) for the plan to address this secondary question of whether

the plaintiff was capable of performing *any* job. *Id.* Thus, the proper course of action was to remand the claim back to the plan administrator to address the "any occupation" question.

By contrast, in *Reich v. Ladish Co., Inc.*, 306 F.3d 519 (7th Cir. 2002), the plan administrator denied the plaintiff's claim for retirement disability benefits, finding that he was no longer an employee at the time of the request and thus was not an eligible plan participant. *Id.* at 521. On appeal, the plan administrator added to its reasons for denying the plaintiff's claim, stating that he did not meet every other criterion for eligibility, such as whether he was "disabled." *Id.* at 524, n.1. The Seventh Circuit rejected the plan administrator's attempt to expand its reasons for denying the plaintiff's claim beyond what it stated in its initial denial, calling the plan's efforts "too late." *Id.* The court noted that the plan "was required to give [the plaintiff] every reason for its denial of benefits at the time of the denial," and thus was prohibited from "litigat[ing] its case in piecemeal fashion" by raising new issues after the fact. *Id.* ("[The plan] may not add new reasons as the litigation proceeds. This inefficiency would waste judicial resources."). The court thus remanded the case to the district court for a determination of benefits. *Id.* at 525.

This case aligns much more with *Reich* than *Pakovich*. As both of those cases point out, ERISA requires every employee benefit plan to provide adequate notice in writing to any employee whose claim for benefits has been denied, setting forth the specific reasons for the denial. 29 U.S.C. § 1133(a). In each of Defendant's responses to Plaintiff's requests for benefits (*i.e.*, Plaintiff's initial request and all subsequent appeals), Defendant denied Plaintiff's claim for benefits based solely on the preexisting condition provision. While the question of whether Plaintiff's condition was a disability is a separate inquiry from whether his condition was preexisting, Defendant never mentioned this question in its reasons for denial, and nothing in its

decision assumes the answer to that question. Further, any determination by Defendant as to whether Plaintiff was disabled (either yay or nay) would not have created any internal inconsistencies with its other determinations. In short, by failing to list Plaintiff's lack of a qualifying disability as a reason for its denial of Plaintiff's claim, Defendant is foreclosed from raising that issue now—Defendant may not litigate this claim in piecemeal fashion. Defendant denied Plaintiff's benefits solely because his condition was preexisting, and under a *de novo* review standard, this Court concluded that Plaintiff's condition was not a preexisting condition. Plaintiff is entitled to a benefit award, and there is no need to remand this case for further review.

Plaintiff also is entitled to plus prejudgment interest on his benefit award. Prejudgment interest is presumptively available for violations of federal law, especially in ERISA cases. See *Shott v. Rush–Presbyterian–St. Luke's Med. Ctr.*, 338 F.3d 736, 745 (7th Cir. 2003); *Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 820 (7th Cir. 2002). However, the parties do not agree on the amount of prejudgment interest at issue, nor do they provide the Court with sufficient, undisputed evidence to calculate Plaintiff's benefit award upon which his prejudgment interest will be based.[4] The parties are instructed to meet and confer to try to reach an agreement as to the amount of the long-term disability benefits and prejudgment interest owed to Plaintiff, and the parties should be prepared to report their progress at the next status hearing. If no consensus is reached, the Court may order supplemental briefing on this issue.

Plaintiff also requests attorneys' fees. The Seventh Circuit has recognized two tests for analyzing whether attorneys' fees are appropriate in ERISA cases:

> The first test looks at the following five factors: 1) the degree of the offending parties' culpability or bad faith; 2) the degree of the ability of the offending parties to satisfy personally an award of attorney's fees; 3) whether or not an

---

[4] When calculating prejudgment interest, the Seventh Circuit directs courts to use the prime rate. *Fritcher*, 301 F.3d at 820. Prejudgment interest also should be compounded monthly. See *Gracia v. Sigmatron Int'l, Inc.*, 130 F. Supp. 3d 1249, 1263 (N.D. Ill. 2015).

award of attorney's fees against the offending parties would deter other persons acting under similar circumstances; 4) the amount of benefit conferred on members of the pension plan as a whole; and 5) the relative merits of the parties' positions. The second test looks to whether or not the losing party's position was substantially justified. In any event, both tests essentially ask the same question: was the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent? In determining whether the losing party's position was "substantially justified," the Supreme Court has stated that a party's position is justified to a degree that could satisfy a reasonable person.

*Kolbe & Kolbe Health & Welfare Benefit Plan v. Med. College of Wisc., Inc.*, 657 F.3d 496, 505–06 (7th Cir. 2011) (internal citations and quotation marks omitted).

Due to the lack of substantive briefing on this issue, the Court will defer ruling on the issue of attorneys' fees at this time. The Court will discuss supplemental briefing on this issue at the next status hearing.

## IV.     Conclusion

For the foregoing reasons, Defendant's motion for summary judgment [39] is denied and Plaintiff's motion for summary judgment [43] is granted. This case is set for further status on October 3, 2016, at 10:00 a.m. to discuss further proceedings and the possibility for settlement.


Dated: September 9, 2016

_____
Robert M. Dow, Jr.
United States District Judge